**UNITED TRUCKING SERVICE, INC., et al., Plaintiffs,**

**v.**

**UNITED STATES of America and the Interstate Commerce Commission, Defendants,**

**and**

**Ryder Truck Lines, Inc., Intervening Defendant.**

**Civ. A. No. 39024.**

United States District Court,
E. D. Michigan, S. D.

May 25, 1973.

Rex Eames of Eames, Petrillo & Wilcox, Detroit, Mich., Russell R. Sage of Major, Sage & King, Alexandria, Va., Wilson, Woods & Villalon, Washington, D. C., Belnap, McCarthy, Spencer, Sweeney & Harkaway, Chicago, Ill., for plaintiffs.

Gordon S. Gold, Detroit, Mich., H. Gordon Homme, Jr., I.C.C., Washington, D. C., for defendants.

John C. Bradley of Rice, Carpenter & Carraway, Washington, D. C., and Eugene C. Ewald of Matheson, Bieneman, Veale & Parr, Detroit, Mich., for intervening defendant.

Before KENT, Circuit Judge, and GUBOW and JOINER, District Judges.

## OPINION AND ORDER

JOINER, District Judge.

*Background.*

This is an action to set aside and annul an Order of the Interstate Commerce Commission granting to Ryder Truck Lines a certificate of public convenience and necessity authorizing Ryder to carry commodities over certain designated routes. This action was brought pursuant to 5 U.S.C.A. §§ 701–706, 28 U.S.C.A. §§ 1336, 1398, 2284, and 2321–2325, and 49 U.S.C.A. §§ 17(9) and 305(g) and (h). Extensive briefs have been filed, a Three-Judge Court convened, and the court has had the benefit of oral argument by counsel.

By application filed May 4, 1967, Ryder sought a certificate of public convenience and necessity, under § 207 of the Interstate Commerce Act, authorizing the transportation of general commodities, with exceptions, over a series of seventeen regular routes. Such application, for purposes of better understanding and consideration herein, is divisible into two segments. The first segment will hereafter be denominated as the "Michigan Rights" and the second segment will be denominated as the "Short Route Rights". The Michigan Rights sought by Ryder in its applica-

tion extend between Cincinnati and Indianapolis, on the one hand, and points located in the southern peninsula of Michigan, including Detroit, Pontiac, Flint, Saginaw, Bay City, Midland, Lansing, Ann Arbor and Jackson. The obtaining of such rights would enable Ryder to institute direct, single-line motor carrier service into Michigan from its presently authorized points in the States of Virginia, North Carolina, South Carolina, Georgia, Florida, Alabama, Tennessee, Mississippi, Louisiana and Texas. The Short Route Rights sought by Ryder extend between Asheville, Statesville and Winston-Salem, N. C., on the one hand, and on the other, Cincinnati and, if granted, would authorize Ryder to operate on a direct basis between its present points in North and South Carolina and Virginia, on the one hand, and, on the other, its presently authorized points in Ohio, Indiana, Illinois and Wisconsin. Each of the plaintiffs in this proceeding filed a formal written protest to the Ryder application and actively participated in the proceedings before the defendant Commission relating to that application.

Prior to the filing of the application with the Commission, Ryder had been granted temporary authority under Section 210a(a) of the Interstate Commerce Act [49 U.S.C.A. § 310a(a)] by an Order of the Temporary Authorities Board of the Commission, dated March 3, 1967, to institute operations generally co-extensive with the Michigan Rights involved in its application. In an action instituted in this court, Civil Action No. 29730, certain of the plaintiffs herein sought a Temporary Restraining Order against the Commission to restrain it from permitting the institution of service by Ryder under the temporary authority Order of March 3, 1967. On March 22, 1967, this court denied the Motion for Temporary Restraining Order, and Ryder instituted service on or about March 23, 1967. Upon petitions for reconsideration filed by some of these plaintiffs who were protestants in that temporary authority proceeding, Division 1 of the Commission, by Order

served May 2, 1967, reversed the aforesaid Order of the Temporary Authorities Board and vacated the grant of temporary authority. The Order of Division 1 of May 2, 1967 was affirmed by a further Order of Division 1, served July 5, 1967. Pursuant thereto, the temporary authority operation of Ryder was terminated on or about August 18, 1967.

This Ryder application was referred to Hearing Examiner Richard A. White for hearing and the recommendation of an appropriate Order thereon. Several Ryder employees were called as witnesses as well as 104 shippers and two connecting carriers who testified in support of the application. Each of the nine plaintiffs in this proceeding called one or more witnesses to present evidence in support of its opposition to the Ryder application. Six of the plaintiffs (GLX, National, United, Jones, Ellis and O & M) were and are opposed to that segment of the application herein denominated as the Michigan Rights; two plaintiffs (Roadway and Hennis) were and are opposed to the application in its entirety, and one plaintiff (Central) was and is opposed to that segment of the application herein denominated as the Short Route Rights. Following the conclusion of the hearings before Examiner White in December, 1969, the parties (including Ryder and the nine plaintiffs in this proceeding) prepared and filed extensive briefs with Examiner White that contained detailed summaries of the evidence of record, argument and proposed findings of fact and conclusions of law.

In his Report served December 3, 1969, Examiner White recommended that the Ryder application be denied except for one portion of the Michigan Rights that would permit Ryder to serve Detroit. He recommended that the rights to serve Detroit from Indianapolis and Cincinnati be granted. He recommended that the requested Short Route Rights be denied, and he recommended that the extensive Michigan Rights sought respecting such cities as Pontiac, Flint, Saginaw, Bay City, Mid-

land, Ann Arbor and Jackson be denied. The entire report of Examiner White embraces nearly 500 pages, and approximately 420 of those pages specifically involved the Ryder application.

Ryder and various protestants (including these plaintiffs) filed exceptions to the Report and Recommended Order of Examiner White. Thereafter, Division 1 of the Commission in a Decision and Order of March 22, 1971 generally affirmed and adopted the statement of facts, the conclusions, and the findings of the Examiner as their own. Ryder argued that the entire application should be granted. The protestants argued that Ryder should not receive authority as to Detroit. The exceptions of one protestant, Tri-State Motor Transit Co. (Tri-State), sought only to reverse that portion of the Examiner's recommended grant of authority to the extent that Ryder would be authorized to transport Class A and B explosives. The interests of Tri-State were confined wholly to the proposed handling by Ryder of Class A and B explosives, and Tri-State is no longer a party to this action. Division 1 in its Decision and Order of March 22, 1971 modified the Examiner's recommended grant of authority to Ryder respecting Detroit so as to exclude any right by Ryder to handle Class A and B explosives. Two other modifications were made by Division 1 respecting certain restrictions included in the Examiner's recommended grant of authority, but these modifications are not at issue in the present case.

Thereafter, on June 14, 1971, Ryder filed a petition for reconsideration respecting the decision of Division 1 of March 22, 1971 in which it argued that Division 1 had erred in excluding Class A and B explosives from the grant of authority made to serve Detroit, and also that Division 1 had erred in denying the application in its entirety respecting the Short Route Rights and the Michigan Rights (except Detroit). Various protestants replied to that petition and certain of such protestants (includ-

ing plaintiffs National, United, Jones, O & M, Ellis and GLX) moved to strike Ryder's petition for reconsideration. Protestants argued that the General Rules of Practice promulgated by the Commission did not allow or permit the filing and consideration of that petition to the extent that it sought reconsideration of the action of Division 1 in affirming and adopting the findings and conclusions of the Examiner.

Appellate Division 1 by Order dated August 20, 1971 reopened the proceeding for reconsideration.

Under date of February 9, 1972 in a 12 page Report and Order on Reconsideration, Appellate Division 1 reversed its prior decision of March 22, 1971 and the decision of the Hearing Examiner and granted the application except for the authority to transport Class A and B explosives. As a condition to its grant of authority, Appellate Division 1 imposed the requirement that Ryder for three years file annual "Performance Reports" with the Commission providing specified information with respect to shipments handled and service provided under the rights granted.

Thereafter, plaintiffs filed petitions with the Commission seeking reconsideration of the aforesaid Decision and Order of February 9, 1972. Those petitions were denied by Appellate Division 1 by its Order of September 6, 1972. Subsequent thereto, certain plaintiffs filed with the Commission a petition seeking a declaration that the proceeding before the Commission involved issues of general transportation importance. Those petitions were denied by the Commission by an Order served October 13, 1972. The proceedings before the Commission were thus terminated with administrative finality and plaintiffs, as parties adversely affected by the Commission's action, are entitled to judicial review.

On October 11, 1972, plaintiffs filed this suit for judicial review of the Commission's Decision and Order. On October 17, 1972, following oral argument

thereon, Judge Charles W. Joiner entered an Order restraining the Commission, until further Order of the court, from (1) permitting the Order of the Commission to become effective, and (2) issuing a certificate of public convenience and necessity to Ryder embracing the operating authority granted to it in that proceeding. The United States and the Commission are named defendants. Ryder was authorized by the court to intervene as a party defendant.

*The Scope of Judicial Review.*

■ The function of a reviewing court is determined by the Administrative Procedure Act, 5 U.S.C.A. § 706. That statute provides in pertinent part that the ". . . reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . unsupported by substantial evidence . . ." Thus the reviewing court must affirm the Commission once it ascertains there is warrant in the law and in the facts for what the Commission has done, United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821 (1946). This is accomplished when the reviewing court determines that the Commission made the findings required by Title 5 U.S.C.A. § 557 in support of its decision and that these findings are supported by substantial evidence, Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 83 S.Ct. 239, 9 L. Ed.2d 207 (1962).

*The Issues.*

The plaintiff protestants assert there are three issues which the court must resolve. It is the plaintiffs' position that resolution of any one issue in its favor would require the court to remand the case to the Commission.

I. *Are the ultimate findings of the Commission inconsistent with its findings of fact?*

The ultimate findings are as follows:

"Upon reconsideration we find that the present and future public conven-

ience and necessity require operation by applicant . . ."

\* \* \* \* \* \*

"We further find that applicant is fit, willing, and able properly to perform such service and to conform to the requirements of the Interstate Commerce Act, and the Commission's rules and regulations thereunder."

The Opinion of Appellate Division 1 (hereinafter "Commission"), 114 M.C.C. 852, contains on page 853 the following paragraph:

"The examiner's report and recommended order, the division's decision and order, and the pleadings have been considered. We find the statement of facts set forth by the examiner and adopted by Division 1 to be correct in all material respects, and we hereby adopt that statement as our own. Certain facts will be restated only for clarity of discussion."

The Examiner's report is in three main parts. The first part is pages 7 to 178 and has the heading *"General"*. The second is pages 179 to 208 and has the heading *"Discussion and Conclusions"*. The third is the appendices, which represents a summary of the testimony of the supporting shippers. The plaintiffs argue the Commission adopted the Examiner's discussion and conclusions as the Commission's findings of fact.

It is readily apparent from even a cursory examination that the Commission, when it used the phrase "statement of facts", was referring to the first segment of the Examiner's report. The Commission expressed itself quite succinctly in its first opinion, which affirmed the Examiner:

". . . the statement of facts, the conclusions, and the findings of the examiner, being proper and correct in all material respects, should be, and they are hereby affirmed and adopted as our own." (Emphasis added.)

The Commission was equally succinct in its second opinion, reversing the Examiner:

"We find *the statement of facts* set forth by the examiner and adopted by Division 1 to be correct in all material respects, and we hereby adopt that statement as our own." (Emphasis added.)

The Commission in its second opinion by not adopting "the conclusions and findings of the Examiner" clearly meant to supply its own conclusions and its own findings.

It is equally apparent that this particular aspect of the case could have been avoided if the author of the opinion had exercised more care. The Examiner did not use the phrase "statement of facts". When adopting a portion of the Examiner's report, the Commission should apply the same designation given that segment by the Examiner.

All the parties agree that the Commission adopted something from the Examiner's report. The Commission at page 856 of its opinion referred to the Examiner having digested the needs of *each individual shipper*. This was done in the appendices, and incorporated by reference into the first segment of the Examiner's report at page 55. It thus becomes obvious that the Commission felt it had adopted the segment of the Examiner's report entitled "General".

Lastly, the discussion and conclusions section of the Examiner's report was written with an eye toward denying the application except for the authority to service Detroit. There is no reason to believe the Commission would adopt as its findings of fact a discussion which pointed to a conclusion quite different from the Commission's ultimate conclusion.

Judicial decisions prior to this case indicate that when the Commission refers to the Examiner's statement of facts the Commission is referring to the Examiner's summary of the evidence and not the Examiner's discussion and conclusions. Continental Southern Lines, Inc.

v. United States, 265 F.Supp. 218 (W. D.La.1967); Morgan Drive-Away, Inc. v. United States, 268 F.Supp. 886 (N.D. Ind.1967); and Scott Truck Lines, Inc. v. United States, 339 F.Supp. 1169 (Colo.1971).

The Commission's findings of fact begin at page 854 of its opinion and merge into the Commission's conclusions at page 859. With one exception it is not disputed that the findings of fact are supported by substantial evidence contained in the Examiner's statement of fact and the record of the proceedings before the Examiner. The protestants placed the hearing level record into evidence at the oral hearing before this court. The one exception regards shipper support in the State of Virginia. The Commission's opinion contains the following language at page 857:

"Finally, shipper support was also introduced showing the movement of traffic between points in North Carolina, South Carolina, and Virginia on the one hand, and, on the other, points in Illinois, Wisconsin, Indiana, Ohio, and Michigan."

It has been suggested by the plaintiffs that there was no shipper support for the movement of traffic from Virginia.

■ If this is error then it is the type of error which is totally harmless, and certainly would not require that this case be remanded to the Commission. The application did not seek any rights to routes originating in Virginia. Nor did the authority granted include any rights to routes originating in Virginia. The presence *or absence* of shipper support for routes originating in Virginia has absolutely no bearing on or connection to the public's need for additional motor carrier service from North Carolina. Plaintiffs have made an effort to cause this case to be remanded on an illusory issue. It cannot matter one whit whether or not there was evidence to support a finding of fact that has no bearing on the authority requested and granted. No case should be remanded

for that which is an irrelevant or harmless error.

The plaintiffs argue in the alternative that if the Commission did not adopt the Examiner's "Discussion and Conclusions" as its findings of fact, then the Commission's opinion is without a finding of fact. And, as another alternative, if the Commission did make a finding of fact, it was an inadequate finding of fact.

The Commission must make findings. This requirement ". . . is merely part of the need for courts to know what it is that the Commission has really determined in order that they may know what to review . . ." City of Yonkers v. United States, 320 U.S. 685, 694–695, 64 S.Ct. 327, 332, 88 L.Ed. 400 (1944). Or as Mr. Justice Cardozo observed, "We must know what a decision means before the duty becomes ours to say whether it is right or wrong." United States v. Chicago, M., St. P. & P. R. R., 294 U.S. 499, 511, 55 S.Ct. 462, 467, 79 L.Ed. 1023 (1935).

The Commission sets forth as findings of fact the problems being experienced by the shippers. For the most part their complaints involve an excessive amount of time required to carry the goods to the point of delivery. Other problems related to difficulty in tracing shipments in order to determine their exact location, inadequate pick-up service, damage to goods in shipment, and disputes over claims arising from the damaged goods.*

---

* The routes granted are divided into two classes:

*Michigan Routes*
1. Cincinnati, Ohio to Detroit, Michigan
2. Indianapolis, Indiana to Detroit, Michigan
3. Van Wert, Ohio to Jackson, Michigan
4. Lima, Ohio to Van Wert, Ohio
5. Jackson, Michigan to Detroit, Michigan
6. Lansing, Michigan to Detroit, Michigan
7. Lansing, Michigan to Flint, Michigan
8. Detroit, Michigan to Bay City, Michigan
9. Midland, Michigan to Saginaw, Michigan
10. Midland, Michigan to Bay City, Michigan
11. Junction M13 and I75 to Junction US10 and I75
12. Jackson, Michigan to Lansing, Michigan

*Short Routes*
1. Statesville, North Carolina to Toledo, Ohio
2. Asheville, North Carolina to Cincinnati, Ohio
3. Toledo, Ohio to Flint, Michigan
4. Winston Salem, North Carolina to Huntington, West Virginia
5. Charleston, West Virginia to Cincinnati, Ohio

The authority granted is restricted against the transportation of traffic (1) having both origin and destination in Michigan, (2) between points in Louisville, Kentucky and points in Indiana, Illinois, Missouri, Ohio and Wisconsin, and (3) to and from points in Michigan interlined at Cincinnati, Indianapolis and Louisville. The obvious purpose of that restriction is to not permit competition for local traffic but to encourage single-line long-haul service.

The finding of "convenience and necessity" as to the Michigan Routes is predicated on inadequate service at interline points of Cincinnati and Indianapolis so as to permit adequate service into Michigan.

The finding of "convenience and necessity" as to the Short Routes is to reduce and eliminate circuity of operation of routes held by Ryder.

There are also findings involving delay in pick up.

The following specific findings in the Opinion support the general findings:

1. "Ryder has been unable to find any connecting carriers that will accept shipments of furniture destined to points in Michigan . . ." page 855.

2. "Ryder has experienced a number of interchange problems, at Indianapolis and elsewhere, which it feels would be eliminated if it were able to perform a single-line service to and from points in Michigan." page 855.

3. "[Evidence has been presented tending to establish that] some carriers refuse to accept interline shipments on the basis of governing division of revenue agreements . . ." page 855.

4. "[Evidence has been presented tending to establish that] some shipments

could not be interlined at Indianapolis, and had to be returned to other terminals . . ." page 855.

5. "At Chicago, applicant has found that shipments often must be offered to more than one carrier before they will be accepted [and] that some shipments would not be accepted by any connecting carriers; and that some shipments were refused by the connecting carrier when first tendered." page 855.

6. "The principal complaint of the shippers is the excessive transit time required for the movement of their traffic." page 856.

7. "Most [shippers] believe that any shipment which remains in transit longer than 3 days from origin to destination between major terminals has been subjected to an unreasonable delay." page 856.

8. "Shippers have found that the greater the number of carriers participating in a move, the longer the time in transit." pages 856–857.

9. "Because of the substantial transit times involved, shippers are occasionally called upon to trace the whereabouts of a given shipment." page 857.

10. ". . . carriers are slow to react to tracing requests, and shipments have been difficult to find." page 857.

11. ". . . a number of shippers, especially those located at more remote points, have had difficulty in obtaining adequate pickup service from most carriers." page 857.

12. "Protestants have either delayed making pickups, presumably until more traffic was available, or refused outright to make the pickup." page 857.

13. ". . . when equipment was finally supplied to these points, shippers have sometimes found it inadequate to handle all of their traffic." page 857.

14. "[Shippers] complained of . . . damage to lading and the resulting disputes about claims. This is another outgrowth of the multiple transfer of lading problem that must occur on so many of the involved shipments." page 857.

15. "The testimony of applicant and the supporting shippers establishes the existence of generally inadequate service in the movement of small shipments traffic in the territory here under consideration—namely, between points in the South and Southeast, on the one hand, and, on the other, Detroit and other Michigan cities, and between points in North Carolina, South Caro-

lina, and Virginia, on the one hand, and, on the other, points in the Midwest." page 859.

16. "We believe that shippers properly have cause for complaint when shipments must be in transit between major cities for the substantial periods described in this proceeding. These delays result from the lack of adequate, single-line service into Michigan and other Midwestern States." page 859.

17. "The requirement that a number of carriers be used has resulted in unreasonable transit times, tracing problems, damage to lading, and resultant claims difficulties." page 859.

18. "Protestants are unwilling to pick up shipments at remote points, and when they do, equipment supplied is often insufficient." page 859.

19. ". . . somewhere along the line, these shipments are being delayed and occasionally damaged. The conclusion is inescapable that joint-line service is simply inadequate to meet the shippers' reasonable transportation needs." page 859.

20. "[Protestants' tariff and interline arrangements] raise the transportation costs to shippers." page 860.

The finding that the applicant is "fit, willing and able properly to perform such services" is supported by the following findings:

1. "Most of the supporting shippers have used applicant's service under temporary authority or are using it now in joint-line operations. They are generally pleased with Ryder's performance, but wish to alleviate delays in interchange and other problems which they are experiencing at various gateways." page 857.

2. "The evidence satisfactorily demonstrates that a direct, single-line service, such as that proposed here, will expedite deliveries, and minimize the several difficulties resulting from use of multiple connecting carriers." pages 859–860.

3. "We see no reason why carriers that wish to provide the shipping public with a complete, efficient, and low-cost transportation service should be held back by carriers with prohibitive and restrictive tariff policies." page 860.

4. ". . . applicant already is serving most of the supporting shippers in this proceeding. They find its service generally satisfactory, and want to continue using it. A grant of authority here will enable applicant to offer a service more responsive to shippers' needs than that presently available." page 860.

From these findings of fact came the Commission's conclusion that "the present and future public convenience and necessity requires operation by the applicant" and "that applicant is fit, willing and able properly to perform such services".

■ The protestants are not correct. The Commission's opinion clearly sets forth its reasons, based upon the adequate findings of fact, for the ultimate findings.

II. *Was the grant of authority contrary to the Commission's own precedents?*

The plaintiffs argue the Commission has a rule that the shippers supporting an application must have tried existing motor carrier service and have found it deficient before a certificate can be issued. The plaintiffs rely on H. C. & D. Moving and Storage Co., Inc. v. United States, 298 F.Supp. 746 (Hawaii, 1969). Despite this rule the Commission, while admitting that each supporting shipper had not investigated all the existing carriers with authority to serve them, granted the petition. Hence the reliance on H. C. & D. Moving and its holding against permitting the Commission to change the rules on which it relies without a full explanation.

The court simply cannot accept the plaintiffs' position for two reasons:

■ 1. The Commission should not be required to apply the rule that each shipper must have tried every available

shipper in an application of this magnitude. The Examiner heard testimony from more than one hundred supporting shippers. The plaintiffs would have the application denied if even one of the supporting shippers (or less than 1% of the support) had failed to try all existing motor carrier service available to that shipper. The Commission recognized the unreasonableness of applying the rule when it noted that the supporting shippers were generally familiar with the existing motor carrier service. Obviously, a rule that was developed and should be applied when there are only one or two supporting shippers, is not necessarily applicable when there is forty or fifty times as much support.

■ 2. The Commission need not, as a matter of law, explain its deviation from a prior practice. This was decided by the Supreme Court more than twenty-five years ago in Federal Communications Commission v. Station WOKO, Inc., 329 U.S. 223, 67 S.Ct. 213, 91 L.Ed. 204 (1946).

III. *Did the Commission violate its own regulation, specifically, 49 C. F.R. § 1100.101(a)(2)?*

■ 49 C.F.R. § 1100.101(a)(2) defines when an Order of the Commission is considered to be administratively final. An Order is final except (1) those involving issues of general transportation importance, and (2) those in which a division reverses, changes, or modifies a prior decision by a hearing officer (the Examiner). The plaintiffs would read that as meaning everything in the Examiner's Order is final except that

---

5. "We are persuaded that applicant will be able to offer a substantially improved service in the form of direct and more expedited service." page 861.
6. "One hundred four shippers and two carriers support Ryder's application." Examiner's Report, page 55. In Appendix C, there is a report on the evidence of the 102 shippers. In addition, a detailed statement of the evidence is made a part of the opinion by incorporating that portion of the Examiner's Report dealing with the interchange problem at Indianapolis, page 17 Examiner's Report; at Chicago, page 24 Examiner's Report; proposed service—Michigan, page 40 Examiner's Report; proposed service—Central States, page 46 Examiner's Report; 1968 Transit Study, page 65 Examiner's Report; and Shippers' Report, page 55 Examiner's Report.

specific portion which was reversed, changed or modified and therefore cannot be reconsidered by the division.

There is nothing in the regulation which supports the position advocated by the plaintiffs. As this court noted in its background statement of the case, the Commission's Order modified the Examiner's position by deleting the right to transport explosives from the partial grant of the requested authority. That modification triggered the regulation's exception to finality and permitted the parties to request the Commission to reconsider its entire position and retained in the Commission power to modify its position.

Section 17(7) of the Interstate Commerce Act [49 U.S.C.A. 17(7)] gives the Commission continuing jurisdiction over its Orders and empowers it to reconsider and rescind or modify an Order at any time when an unjust or unwarranted result has been produced. The administrative finality of an Order does not terminate this continuing jurisdiction. It merely indicates ripeness for judicial review. Most courts are in accord with this view. Chicago and Northwestern Railway Co. v. United States, 311 F.Supp. 860 (N.D.Ill.1970), Resort Bus Lines, Inc. v. Interstate Commerce Commission, 264 F.Supp. 742 (S.D.N.Y.1967) and Alamo Express Inc. v. United States, 239 F.Supp. 694 (W.D.Tex.1965).

The plaintiffs contend an administrative agency's regulations are binding on both the administrative agency and the parties before it. School District 2 Fractional v. United States, 229 F.2d 681 (6th Cir. 1956) and Upjohn Co. v. Pennsylvania R. Co., 381 F.2d 4 (6th Cir. 1967). This is not at issue here because the Commission has not acted in violation of any of its regulations.

There is no error. The Order of the Commission should stand. The temporary restraining order and preliminary injunction are dissolved.

So ordered.