**UNITED STATES of America,**
**Plaintiff,**

**v.**

**INTERSTATE COMMERCE COMMISSION et al., Defendants,**

**and**

**The Aberdeen and Rockfish Railroad Company, et al., Intervening Defendants.**

**Civ. A. No. 3453–61.**

United States District Court
District of Columbia.

Sept. 19, 1963.

John W. Douglas, Asst. Atty. Gen., David C. Acheson, U. S. Atty. for District of Columbia, Harland F. Leathers and George H. Jones, Jr., Attys., Dept. of Justice, Washington, D. C., for plaintiff.

Francis A. Silver, Associate Gen. Counsel for Interstate Commerce Com-

mission, Washington, D. C., for defendants.

Henry J. Karison and Robert J. Corber, Washington, D. C., and J. Edward McDonald, New York City, for intervenors.

HOLTZOFF, District Judge.

The issue in this action is whether freight rates on railroad shipments of knocked-down motor vehicles and motor vehicle chassis, as approved by the Interstate Commerce Commission, are unreasonable and excessive. This suit is brought by the United States as a shipper of the commodity, to set aside an order of the Commission ratifying the rates charged by railroads. The matter is before this Court at this time on cross-motions for summary judgment.

This litigation arises in an unusual manner. In 1943 the Government shipped carloads of knocked-down motor vehicle chassis over the Chesapeake and Ohio Railroad and paid the transportation charges according to the tariff then prevailing. Harrison Construction Company and Grafton Coal Company shipped similar articles over the Pennsylvania Railroad and the Baltimore and Ohio Railroad, respectively. These two shippers subsequently brought proceedings before the Interstate Commerce Commission claiming that the rates were excessive. The Commission sustained their contention, held that the freight rates charged on this commodity were unreasonable and excessive, determined what the maximum allowable rates should be, and directed reparation for the excess.

Subsequently the General Accounting Office of the United States, on the basis of the decision of the Interstate Commerce Commission in the Harrison and Grafton cases, ruled that the Chesapeake and Ohio Railroad Company had been overpaid on the Government shipments. In order to secure reimbursement of these alleged overcharges, the General Accounting Office directed that corresponding deductions be made from other freight bills that later became due to the Railroad from the Government. The Chesapeake and Ohio Railroad Company then instituted an action in the Court of Claims to recover the amounts so deducted. That Court stayed the prosecution of the suit until the reasonableness of the rates could be determined by the Interstate Commerce Commission. Following this order of the Court of Claims the United States brought an appropriate proceeding before the Commission, seeking a review of the freight rates in question. The Commission reopened the Harrison and Grafton cases also, consolidated the three, and heard them together. The Commission concluded that its prior decision had been erroneous and that the rates actually charged by the railroads were not unreasonable or excessive. The Government then filed the complaint in the present action to review and set aside the order of the Interstate Commerce Commission. A large number of Class 1 railroads were permitted to intervene as defendants.

Authority for maintaining this action is found in 49 U.S.C. § 17(9), which reads as follows:

"When an application for rehearing, reargument, or reconsideration of any decision, order, or requirement of a division, an individual Commissioner, or a board with respect to any matter assigned or referred to him or it shall have been made and shall have been denied, or after rehearing, reargument, or reconsideration otherwise disposed of, by the Commission or an appellate division, a suit to enforce, enjoin, suspend, or set aside such decision, order, or requirement, in whole or in part, may be brought in a court of the United States under those provisions of law applicable in the case of suits to enforce, enjoin, suspend, or set aside orders of the Commission, but not otherwise."

■■ The fixing of railroad freight rates is a complex and intricate undertaking requiring expert knowledge and skill. It differs from the determination of rates to be charged by public utilities of other types. Most public utilities,

other than those in the transportation field, deal in a single commodity or service, such as gas, electric power, telephone service, and the like. In such cases, it is necessary to calculate what income is likely to be received by the utility if the rate is fixed at a specified amount, and ascertain whether the expected earnings would result in a fair return. In the case of transportation facilities, however, rates must be established on hundreds, or possibly thousands, of different commodities. The question then becomes, in part, whether the entire rate structure comprising the sum total of the income to be realized from all shipments of these many types, will result in a fair return to the carrier. No one freight rate may be considered individually. The entire group with its innumerable ramifications must be evaluated as a whole, like a piece of tapestry composed of thousands of individual threads of various colors and hues. It is a resultant of many elements. Economic effects of particular rates on communities which they affect, and on lines of business to which they relate; the extent to which they are likely to attract shipments to transportation facilities of a specific type or draw it to competitors; the amount of charges that the traffic will bear and numerous other factors must all be weighed in determining the reasonableness of freight rates. The task comprehends much more than mathematical computations. The outcome depends on sound judgment and keen discernment based on an appraisal of the various considerations and their interrelation. Obviously strong reliance must be placed on the expertise of the regulating agency.

 It is well settled that the scope of judicial review of final decisions of administrative agencies is narrow. It is limited and restricted to determining whether the agency committed any errors of law, or transcended the legal limitations on its authority; whether there is substantial evidence to sustain its findings of fact; and whether the result reached was arbitrary or capricious. The Courts are not empowered to con- sider and weigh the evidence *de novo* and reach an independent conclusion. These considerations are of particular weight in connection with matters such as rate fixing in which technical knowledge and expert skill play a large part.

In Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286, 287, 54 S.Ct. 692, 694, 78 L.Ed. 1260, Mr. Justice Cardozo aptly summarized these principles, as follows:

"The structure of a rate schedule calls in peculiar measure for the use of that enlightened judgment which the Commission by training and experience is qualified to form. [Case cited.] It is not the province of a court to absorb this function to itself. [Cases cited.] The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body."

Other authorities that sustain or apply these principles are legion. It suffices to cite only a few. Interstate Commerce Commission v. Union Pacific R. Co., 222 U.S. 541, 547–548, 32 S.Ct. 108, 56 L.Ed. 308; Consolidated Edison Co. of New York v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; United States v. Pierce Auto Freight Lines, 327 U.S. 515, 535–536, 66 S.Ct. 687, 90 L.Ed. 821; Atwood's Transport Lines, Inc. v. United States, D. C., 211 F.Supp. 168, 173, affirmed 373 U.S. 377, 83 S.Ct. 1312, 10 L.Ed.2d 420; Easton Pub. Co. v. Federal Communications Commission, 85 U.S.App.D.C. 33, 175 F. 2d 344, 349; Interstate Commerce Commission v. Martin Brothers Box Co., 9 Cir., 219 F.2d 811, 813; American Union Transport, Inc. v. United States, 103 U. S.App.D.C. 229, 234, 257 F.2d 607, 612.

The voluminous record before the Hearing Examiner, whose conclusions were confirmed and adopted by the Commission, contains a great deal of oral testimony and numerous exhibits tending to sustain the fairness of the rates approved by the Commission, and explaining the method by which they were

reached. The Commission rendered a detailed opinion, in the course of which it made the following significant observations:

"Classification is not an exact science. Basically it is simply a determination of reasonable relations between commodities, with grouping of kindred articles. [Case cited.] It is not unusual for articles with similar physical characteristics to be included in a single group for rating purposes, even though there is a wide range of value and weight density. [Case cited.]"

To make a comprehensive summary of the evidence before the Commission would unnecessarily prolong this opinion to an inordinate length. For our purposes, it suffices to give an indication of the nature of some of the evidence that was presented to the Commission, without attempting an exhaustive enumeration. The history of rate structures generally during the war years and of the rates on the commodities involved in this proceeding, was discussed by witnesses in detail. Comparisons were introduced between the rates on knocked-down automobile chassis, and those on other similar articles. Evidence was adduced concerning the amount, volume and weight of shipments of the type in question. A showing was made as to what rate would be low enough to attract more business to the railroads, but high enough to make it attractive to the carrier.

■ It is evident that the decision of the Hearing Examiner and the subsequent ruling of the Commission were reached after careful study of all of the relevant and extensive data that were presented at the hearings. The Court perceives no basis for holding that there was no substantial evidence to sustain the order of the Commission, or for reaching a conclusion that the rates approved by the Commission are unreasonable or excessive. Obviously, there was nothing arbitrary or capricious, or in violation of law, in the action of the Commission. Government counsel do not demonstrate the contrary. Consequently it is an inescapable conclusion that the findings of fact made by the Commission are sustained by substantial evidence.

■ It is contended by the Government that the Commission committed reversible error in admitting certain evidence that the Government claims should have been excluded under the rules of evidence relating to competency. A consideration of this point must commence with a brief discussion of the extent, if any, to which the common law rules of evidence are applicable in proceedings before administrative agencies. It is hardly necessary to be reminded of the fact that the law of evidence was originally developed for jury trials. The Chancellor did not apply it in the court of equity. Any evidence that was relevant was admitted in equity, subject necessarily to the evaluation of its probative weight. The liberality prevailing in equity continued in the Federal courts to a large extent as long as there was a separation between law and equity, that is until 1939. The existence of the distinction between the rules of evidence applicable in actions at law and the more liberal practice prevailing in equity, was recognized in Rule 43(a) of the Federal Rules of Civil Procedure, which contains a provision that, "All evidence shall be admitted which is admissible under * * * the rules of evidence heretofore applied in the courts of the United States on the hearing of suits in equity, * *." The history of this provision tends to indicate that it was adopted at the instance of the Patent Bar, because patent lawyers wanted to assure a continuation of the liberal practice as to admissibility of evidence prevailing in patent cases. In trials by the Court without a jury, erroneous admission of evidence is not generally regarded as reversible error. The situation may be otherwise in respect to rulings excluding evidence that should have been admitted.

■ The courts have not imposed on administrative agencies any rigid requirement that they must exclude all evidence that would not be admitted at a trial before a judicial tribunal. Admin-

istrative agencies, therefore, are not bound by the rules of evidence relating to competency. Federal Trade Commission v. Cement Institute, 333 U.S. 683, 705–706, 68 S.Ct. 793, 92 L.Ed. 1010; Montana Power Co. v. Federal Power Commission, 87 U.S.App.D.C. 316, 323, 185 F.2d 491. An entirely different question arises if an agency excludes evidence that should have been admitted. This discussion relates to the subject of admitting evidence.

The objection of the Government to the admissibility of evidence is directed to a transcript of the testimony of several witnesses in two other proceedings tried before the Commission. The United States was also a party in the earlier cases, and Government counsel had an opportunity to cross-examine the witnesses. The Commission overruled the objection of the Government to the admission of this transcript and indicated that Government counsel would have a right to call these witnesses and cross-examine them in the hearing then pending. The argument of Government counsel that the parties to the proceedings involved in Exhibit No. 13 were different from those in this instance, is untenable. It was urged that because different departments of the Government were involved, it must be deemed that the parties in the proceedings were not the same. Government counsel are in error. The United States of America is a single entity. Its various departments and administrative agencies may not sue and are not suable as such.[1] Irrespective of this consideration, however, the rules of the Interstate Commerce Commission specifically provide for the admission of transcripts of evidence in other proceedings, subject to certain safeguards and limitations. The Court concludes that the Commission did not commit any reversible error in admitting the evidence.

Finally, it is urged by the Government that it was unreasonable for the Interstate Commerce Commission to grant a rehearing of its original decision after the long interval of time that elapsed between the original decision and the reopening of the proceedings. This objection is disposed of by the following provision of 49 U.S.C. § 17(6):

"After a decision, order, or requirement shall have been made by the Commission, a division, an individual Commissioner, or a board, or after an order recommended by an individual Commissioner or a board shall have become the order of the Commission * * * any party thereto may at *any time,* subject to such limitations as may be established by the Commission as hereinafter authorized, make application for rehearing, reargument, or reconsideration of the same, or of any matter determined therein." (Emphasis supplied.)

The words "any time" mean "any time"; they do not mean "within a reasonable time". No case has been cited in which an order of the Interstate Commerce Commission on reconsideration of an earlier decision was set aside because of lapse of time between the two. It is obvious that it was the intention of Congress to confer upon the Commission the flexible power to change its decisions after rehearing at any time.

In view of the foregoing considerations, no reason is discernible for setting aside the order of the Interstate Commerce Commission sought to be reviewed in this action.

The plaintiff's motion for summary judgment is denied. The motion of defendants and intervenors for summary judgment is granted.

---

1. The rule is otherwise as to Government-owned or Government-controlled corporations, but this is an aspect of the matter that is not involved here.